

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0436-22

### IJAH IWASEY BALTIMORE, Appellant

### v.

### THE STATE OF TEXAS

## ON STATE'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE TENTH COURT OF APPEALS
## MCLENNAN COUNTY

NEWELL, J., delivered the opinion of the Court in which
HERVEY, RICHARDSON, WALKER, SLAUGHTER and MCCLURE, JJ., joined.
YEARY, J., filed a dissenting opinion. KEEL, J., filed a dissenting
opinion in which KELLER, P.J., joined.

### OPINION

Does sworn, unchallenged testimony on a material issue have

probative value?  Yes.  Sworn unchallenged testimony on a material

issue has probative value. If we were considering whether sworn unchallenged testimony on a material issue is admissible that might resolve the case. But the question before us does not concern admissibility. Rather, the question before us is whether all the evidence presented in this case was legally sufficient to prove beyond a reasonable doubt that a particular parking lot amounted to a "premises" licensed to sell alcoholic beverages. The court of appeals in this case did not hold that particular testimony lacked probative value, it held that the State did not present legally sufficient evidence to prove an element of a punishment enhancement beyond a reasonable doubt. We agree with the court of appeals that the evidence does not prove that element beyond a reasonable doubt. Consequently, we affirm.

## Facts

One evening, Appellant went to the Crying Shame, a bar located in McLennan County.[1] He parked his motorcycle near the bar's entrance, and before he entered the establishment, he put his registered handgun in the saddle bag attached to his vehicle.[2] After spending less

---

[1] Appellant does not contest that the Crying Shame is an establishment licensed by the Texas Alcoholic Beverage Commission to sell alcoholic beverages, though the State did not introduce a copy of the license into evidence or otherwise call any employees from the Crying Shame to testify on that issue.

[2] It is undisputed that Appellant did not carry his gun inside of the bar.

than thirty minutes inside, Appellant exited the bar to go home. At his motorcycle, Appellant retrieved his gun from the saddle bag and placed it in the waistband of his pants. Before Appellant left the parking lot, three bar patrons, James Johnson, Davina Cook, and Leonard Hill, exited the bar and approached Appellant.

A few months prior to this, Appellant and Johnson had gotten into a verbal disagreement at the same bar. But on the night at issue, the dispute escalated into a physical altercation between Appellant, Johnson, and Hill. The parties contested the precise location where the altercation started, how it started, and whether Appellant walked towards Johnson and Hill before pointing the gun at Johnson. But it is clear from the record that the altercation took place in the parking lot inside or near Appellant's parking spot outside the bar.

At some point during the altercation, Appellant's gun was removed from his pants and Hill threw it onto the roof of the bar.[3] During the altercation, the bar's management called the police and locked the

---

[3] The parties presented conflicting testimony on whether Appellant or Hill removed the gun from Appellant's waistband. Appellant testified that he did not pull out his gun, but instead, his hand was grabbed by Hill while Appellant was adjusting his waistband to prevent the gun from falling out of his pants and Hill then removed the gun from his pants. Johnson and Cook both testified that Appellant pulled the gun out from his pants. Hill was not a witness at Appellant's trial.

remaining patrons inside the bar.[4] When officers arrived, the altercation had de-escalated, and Appellant, Johnson, and Hill were standing on the sidewalk located just outside the bar's entrance. Shortly thereafter, Johnson was arrested on the scene for outstanding warrants.

At the jail, Johnson gave a statement about the altercation. Johnson stated that Appellant had pointed the gun at him during the altercation, but that Johnson did not fear for his life in that moment. The State charged Appellant with unlawful carrying of a weapon, typically a Class A misdemeanor offense.[5] However, the State enhanced the charge to a third-degree felony by alleging the offense occurred on a "premises" licensed to sell alcoholic beverages.[6] Appellant initially pleaded guilty but shortly thereafter withdrew his plea because a proposed condition of the deferred adjudication community supervision

---

[4] When officers arrived on the scene, they spoke with the Crying Shame's management. At trial, the State did not offer any evidence from the bar's owners, management, or employees.

[5] Tex. Penal Code Ann. § 46.02(a)(1) (2016), *amended by* Act of June 15, 2017, 85th Leg., R.S., ch. 1049, 2017 Tex. Gen. Laws 4106, 4107.

[6] Since the date of the offense in Appellant's case, the relevant statutory enhancement has been repealed. Tex. Penal Code Ann. § 46.02(c) (2016), *amended by* Act of June 15, 2017, 85th Leg., R.S., ch. 1049, 2017 Tex. Gen. Laws 4106, 4107 (repealed 2021). Though the statutory enhancement was repealed, it is still a third-degree felony offense to carry a weapon while on the "premises" of an establishment licensed or permitted to sell alcohol under the Texas Penal Code. *See* Tex. Penal Code Ann. § 46.03(a)(7) ("A person commits an offense if the person intentionally, knowingly, or recklessly possesses or goes with a firearm . . . on the premises of a business that has a permit or license issued under . . . [the Texas] Alcoholic Beverage Code, if the business derives 51 percent or more of its income from the sale or service of alcoholic beverages for on-premises consumption . . ."). However, under this statute, "premises" now excludes "any public or private driveway, street, sidewalk or walkway, parking lot, parking garage, or other parking area." *See* Tex. Penal Code Ann. § 46.03(c)(4).

was that he would not be allowed to possess a handgun.[7]  Appellant then proceeded to trial.

## Trial

The State's theory at trial was that Appellant possessed a gun while in the parking lot and that this parking lot was part of the "premises" of the Crying Shame, and therefore constituted a "premises licensed or issued a permit by this state for the sale of alcoholic beverages."  To prove its theory, the State introduced testimony from three law enforcement officers.  Detective Joe Williams testified that he had worked with the Waco Police Department for about thirty years, first as a patrol officer and in his most current role within the detective's unit, he investigated assault and financial crimes.  Williams testified that his only role in Appellant's case was to identify the owner of the handgun recovered by another officer who was present at the scene that night.  After addressing his role in identifying Appellant as the owner of the gun, Williams testified to the following:

> Q: […] And to be clear, the Crying Shame is a bar, an establishment here in McLennan County?

---

[7] During the sentencing hearing for his plea, Appellant and his attorney asked the trial court to reconsider the condition disallowing Appellant to possess his handgun.  Appellant's attorney informed the court that Appellant was a former military serviceman and had also previously worked as a security guard where he had carried a gun.  The trial court left the condition in place because Appellant was not currently working in a job that required him to carry a handgun.  The court further stated that if the circumstance arose where Appellant needed to carry a handgun for work, then Appellant could talk to his community supervision officer.

A: That's correct.

Q: And it is licensed to sell alcohol by the TABC?

A: Yes.

Q: And that's the Texas Alcoholic Beverage Commission?

A: That's correct.

Q: And then included as part of the premises of the Crying Shame, that includes the parking lot?

A: Yes.

Q: And the legal definition of premises, for purposes of this statute, includes the parking lot?

A: Yes.

Q: And to your knowledge and in your work on this case, is Ijah Baltimore the owner or did he work at the Crying Shame?

A: He's just the owner of the weapon.

Williams stated that he did not go out to the scene on the night of the offense, nor did he talk to any of the witnesses. He offered no testimony regarding his familiarity with the Crying Shame, the parking lot, or the source of his conclusion that the Crying Shame's "premises" included the parking lot. Nor did Williams provide any testimony explaining how his experience in law enforcement qualified him to come to the legal conclusion that the parking lot in front of the bar was part of the Crying

Shame's "premises." He did not explain what he thought the legal definition of "premises" was or which statutory definition he was referring to.

Next, the State offered the testimony of Officer Bill Gann, a law enforcement officer with eight years of experience. Gann arrived on the scene as a backup officer, along with two other officers, and was tasked with interviewing witnesses to figure out how the altercation occurred.[8] Gann's main witness contact on the scene that night was Johnson, and after finding out that Johnson had outstanding warrants, Gann placed him under arrest. Gann took Johnson's statement at the jail. After explaining his role in Appellant's case, Gann testified to the following:

> Q: And all of this happened in the parking lot of the Crying Shame?
>
> A: Yes.
>
> Q: Which, again, is a – a bar in McLennan County?
>
> A: It is a bar. It's licensed to sell alcohol through TABC. Yes.

Gann did not offer the basis for his opinion that the Crying Shame was a bar licensed to sell alcohol through the Texas Alcoholic Beverage

---

[8] Gann testified that he arrived on the scene with Sergeant Patterson and that Patterson went inside of the building to talk with the Crying Shame's management. Gann also testified that Officer Mason arrived on the scene as the primary officer on the case. Neither Patterson nor Mason testified at Appellant's trial.

Commission, nor did he testify as to whether the parking lot was part of the "premises" of the Crying Shame.

The State also offered the testimony of Officer Brandon Garrett, a law enforcement agent with thirteen years of experience. He testified that he didn't patrol the area where the bar was located, but often responded to calls in that area because it was within his district. Garrett arrived on the scene as a secondary officer but was then tasked by the primary officer with recovering the handgun from the roof of the Crying Shame. He also interviewed Cook while on the scene. Through Garrett's testimony, the State offered, and the trial court admitted, the recovered gun and multiple photographs as exhibits. One exhibit was a close-up photograph of the primary officer's notepad, and the other six exhibits admitted were close-up photographs of the handgun. After describing the evidence that he collected from the scene, Garrett testified to the following:

> Q: Did you learn that the defendant, Ijah Baltimore, he did not work at the Crying Shame, correct?
>
> A: Correct.
>
> Q: He did not own the Crying Shame, correct?
>
> A: Correct.
>
> Q: So this wasn't a property or premises that was under his control, correct?

A: Correct.

Q: It was your understanding and what you learned you're your investigation that he was a patron there who was just drinking?

A: Yes, ma'am.

Garrett also stated that the Crying Shame was licensed to sell alcohol by the State of Texas and TABC. Other than testifying that Appellant did not control the "property or premises," Officer Garrett did not offer testimony regarding the parking lot.

The State also offered the testimony of both Johnson and Cook. After detailing his version of events on the night of the offense, Johnson testified to the following:

Q: All right. And this whole tussle takes place in the parking lot of the Crying Shame?

A: Correct.

Q: And that is a bar?

A: Correct.

While detailing her version of events on the night of the offense, Cook testified to the following:

Q: Okay. This all took place in the parking lot of the Crying Shame?

A: Yes.

Q: Okay. So this was on the property of the Crying Shame?

A: Yes.

Q: Okay.

A: In the front.

The State elicited testimony from Cook regarding her employment as a property manager for six months prior to trial, but otherwise Cook offered no basis for her conclusion that the parking lot was "on the property of the Crying Shame." Also, during Cook's testimony, the State introduced Exhibit Numbers 7 and 8:

 

Cook testified that both exhibits fairly and accurately depicted the parking lot and that Appellant's motorcycle was positioned in front of the building.

Ultimately, the State presented evidence that the Crying Shame was a bar and neither the bar nor the parking lot in front of the bar were

under Appellant's control.  The State's evidence that the parking lot was included within the bar's "premises" consisted of opinion testimony from Detective Williams who was never asked to give a basis for that opinion. Neither was he asked to explain his understanding of the legal meaning of the word "premises."  The State also elicited testimony from Cook who testified that the parking lot was part of the "property" of the Crying Shame, but the State did not ask her to give a basis for that opinion either.  The remainder of the testimony established that the Crying Shame was a bar licensed to sell alcohol and that the offense occurred in the parking lot in front of the bar's entrance.

Appellant's defense at trial centered on the theory that he did not commit the offense because he was directly en route to his motorcycle immediately before the altercation.[9]  According to Appellant, he took his gun out of his saddlebag and tucked it into his waistband as he was about to get onto his motorcycle to leave the parking lot.  Appellant maintained that the altercation was started by Johnson and Hill and occurred just as he was about to get onto his motorcycle.  With Appellant's testimony, both sides rested.

---

[9] *See* Tex. Penal Code Ann. § 46.02(a)(2) (2016), *amended by* Act of June 15, 2017, 85th Leg., R.S., ch. 1049, 2017 Tex. Gen Laws 4106, 4107 (a person does not commit the offense of unlawful carrying of a weapon if the person was "inside of or directly en route to a motor vehicle…that is owned by the person or under the person's control").

The jury charge defined "premises" pursuant to Sec. 11.49(a) of the Alcoholic Beverage Code rather than the definition provided by the Texas Penal Code.[10]  The application paragraph of the jury charge read as follows:

> A person commits an offense if he intentionally or knowingly carries on or about his person, a handgun, if the person is not on the person's own premises or premises under the person's control; or inside of or directly en route to a motor vehicle that is owned by the person or under the person's control. The offense of Unlawfully Carrying a Weapon is a felony if the offense is committed on any premises licensed or issued a permit by this state for the sale of alcoholic beverages.

"Premises," as defined by the jury charge, includes:

> the grounds and all buildings, vehicles, and appurtenances pertaining to the grounds, including any adjacent premises if they are directly or indirectly under the control of the same person.

Neither party objected to the charge's use of the Alcoholic Beverage Code's definition rather than the charged statute's definition.  The jury found Appellant guilty of the third-degree felony offense of unlawful carrying of a weapon as alleged in the indictment.  Appellant was sentenced at four years in the Texas Department of Criminal Justice.  At

---

[10] Tex. Alco. Bev. Code Ann. § 11.49(a) (2016), *amended by* Act of June 9, 2017, 85th Leg., R.S., ch. 544, 2017 Tex. Gen Laws 1515, 1516; *see also* Tex. Penal Code Ann. § 46.02(a-2); Tex. Penal Code Ann. § 46.02(c) (2016).

the jury's recommendation, the court probated Appellant's sentence for four years.

## Appeal and Petition for Discretionary Review

On appeal, Appellant argued that the State did not prove beyond a reasonable doubt that the parking lot was part of the "premises" of the Crying Shame. Relying upon the definition of "premises" contained in the jury charge, Appellant contended that the State provided no evidence establishing that the parking lot constituted "grounds" or "adjacent premises" that were "directly or indirectly under the control of [the Crying Shame]."[11] The State responded that the jury could have reasonably concluded from witness testimony that the parking lot was the bar's "premises." The State furthered that the photographic evidence revealed that the parking lot was connected to the bar.

The court of appeals initially held that the State's evidence was sufficient to prove beyond a reasonable doubt that Appellant committed the offense on the bar's "premises" and affirmed the trial court's judgment.[12] In its analysis, the court of appeals relied on the Alcoholic Beverage Code's definition of "premises" for purposes of analyzing

---

[11] *See Id*.

[12] *Baltimore v. State*, 608 S.W.3d 864, 869 (Tex. App.—Waco 2020), *vacated*, 631 S.W.3d 727 (Tex. Crim. App. 2021).

sufficiency of the evidence. Neither party challenged the use of the Alcoholic Beverage Code's definition of "premises" for evaluating the sufficiency of the evidence on appeal.[13]

This Court granted Appellant's petition for discretionary review challenging the court of appeals' legal sufficiency analysis. Shortly thereafter, we decided *Curlee v. State*.[14] In *Curlee*, we held that factually unsupported lay opinion testimony was insufficient to support the legal conclusion that a playground was "open to the public" as required to uphold the defendant's conviction for possession of a controlled substance within 1,000 feet of a drug-free zone.[15] We remanded to the court of appeals for reconsideration in light of our

---

[13] *Id*. at 867 n.2 ("No challenge has been made to the propriety of the instruction given in the jury charge; therefore[,] we will assume without deciding that the instruction was proper."). In responding to Appellant's argument that there was no evidence regarding the boundaries of the "premises," the court of appeals stated that any issues regarding the definition of "premises" were not before the court and would not be considered. *Id*. at 867-68 n.3 ("We should not be understood as holding that the parking lot of a business that is licensed to sell alcoholic beverages is necessarily part of the premises as that term is used in connection with the penal code provision at issue in this appeal. Nor have we been asked to determine whether "premises" as defined by the Alcoholic Beverage Code is consistent with or even relevant to the penal code provisions regarding "premises" as defined elsewhere in the penal code. Those issues are simply not before us in this appeal. [Appellant] has not contested the jury's finding that he unlawfully possessed the firearm. The only question is whether for this offense the State proved that the area immediately outside the front door and the parking lot are premises of [the] Crying Shame.").

[14] *Curlee v. State*, 620 S.W.3d 767 (Tex. Crim. App. 2021).

[15] *Id*. at 786.

opinion in *Curlee* noting it "might apply to the testimony about whether Appellant was on a 'premises' licensed to sell alcoholic beverages."[16]

On remand, the court of appeals held that the State's evidence was legally insufficient to support the statutory enhancement beyond a reasonable doubt.[17] Considering the Alcoholic Beverage Code's definition of "premises," the court of appeals reasoned that the State did not provide any factual basis upon which the opinions of the witnesses were formed to support that the parking lot was directly or indirectly under the control of the Crying Shame:

> Our review of the record shows that those witnesses each answered in the affirmative when the State asked them if the parking lot was the parking lot of [the] Crying Shame, and that [the] Crying Shame was licensed to sell alcoholic beverages. However, like the evidence in *Curlee*, there was no basis given for any of the witnesses' opinion as to the parking lot being part of the premises of [the] Crying Shame. There was no testimony from an owner, employee of [the] Crying Shame, or any other person who was familiar with what constituted the premises or whether the parking lot was directly or indirectly under the control of [the] Crying Shame, there was no evidence as to what premises were actually listed in [the] Crying Shame's permit, nor was there any

---

[16] *Baltimore v. State*, 631 S.W.3d 727, 728 (Tex. Crim. App. 2021) (mem. op.). Appellant contended in his petition before this Court that it was important that we determine the applicable statutory definition of "premises" for purposes of an evidentiary sufficiency review. However, because we remanded Appellant's case back to the court of appeals for reconsideration in light of our holding in *Curlee*, we did not answer that question, nor address whether that question was preserved for review.

[17] *Baltimore v. State*, No. 10-19-00196-CR, 2022 WL 2977480, at *2 (Tex. App.—Waco July 27, 2022, pet. granted) (mem. op., not designated for publication).

other evidence as to why the witnesses believed that the parking lot was part of the premises of [the] Crying Shame.[18]

The court of appeals reversed Appellant's conviction, held he was guilty of the lesser-included Class A misdemeanor offense, and remanded to the trial court for a new punishment hearing.[19]  The State now asks us to review the propriety of the court of appeals' holding.[20]

## Standard of Review

The Fourteenth Amendment's guarantee of due process of law prohibits a criminal defendant from being convicted of an offense and denied his liberty except upon proof sufficient to persuade a rational trier of fact beyond a reasonable doubt of every fact necessary to constitute the offense.[21]  In a criminal trial, the State carries the burden of persuading the fact-finder that the defendant is guilty of the offense

---

[18] *Id*.

[19] *Id.* at *3.

[20] We granted review to determine whether "sworn, unchallenged testimony on a material issue has probative value."

[21] *In re Winship*, 397 U.S. 358, 364 (1970) ("Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."); *see also Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003) ("The Fourteenth Amendment's guarantee of due process of law prohibits a criminal defendant from being convicted of an offense and denied his liberty except upon proof sufficient to persuade a rational fact finder of guilt beyond a reasonable doubt.").

beyond a reasonable doubt.[22] Evidence supporting a conviction is legally sufficient if a rational trier of fact could have found that the defendant committed each element of the offense beyond a reasonable doubt.[23] A "mere modicum" of evidence, however, is not sufficient to rationally support a conviction beyond a reasonable doubt.[24] Therefore, the question considered on an evidentiary sufficiency review is not whether there was *any* evidence to support a conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt.[25] In this way, legal sufficiency review

---

[22] *Speiser v. Randall*, 357 U.S. 513, 526 (1958) ("Due process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt."); *see also Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016) (noting that "the State must prove that a defendant is guilty beyond a reasonable doubt").

[23] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."); *see also David v. State*, 663 S.W.3d 673, 678 (Tex. Crim. App. 2022) ("Evidence supporting a conviction is legally sufficient if a rational trier of fact could have found each element of the offense beyond a reasonable doubt.")

[24] *McGinn v. State*, 961 S.W.2d 161, 168 (Tex. Crim. App. 1998) (quoting *Jackson*, 443 U.S. at 320).

[25] *Jackson*, 443 U.S. at 320. ("Any evidence that is relevant—that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence, cf. Fed. Rule Evid. 401—could be deemed a "mere modicum." But it could not seriously be argued that such a "modicum" of evidence could by itself rationally support a conviction beyond a reasonable doubt.").

ensures that the State carries its burden at trial to prove each element of the offense beyond a reasonable doubt.[26]

When assessing the sufficiency of the evidence to support a criminal conviction, reviewing courts consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found that the State has proven the essential elements of the crime beyond a reasonable doubt.[27]  This standard gives full responsibility to the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.[28]  Reviewing courts consider the cumulative force of all evidence[29] to determine whether the evidence was sufficient to establish each element of the offense.[30]

---

[26] *Id*. at 315-16 ("The constitutional standard recognized in the *Winship* case was expressly phrased as one that protects an accused against a conviction except on 'proof beyond a reasonable doubt . . .' In subsequent cases discussing the reasonable-doubt standard, we have never departed from this definition of the rule or from the *Winship* understanding of the central purposes it serves."); *see Winship*, 397 U.S. at 364.

[27] *Id*. at 319.

[28] *Id*.

[29] *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("[A] court considers only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict.") (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

[30] *Lee v. State*, 537 S.W.3d 924, 926 (Tex. Crim. App. 2017) (citing *Jackson* 443 U.S. at 318-19).

A determination of evidentiary sufficiency is measured by the essential elements of the offense as defined by a hypothetically correct jury charge.[31] Reviewing courts measure sufficiency by comparing the evidence produced at trial to the essential elements of the offense as defined by the hypothetically correct jury charge.[32] A hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.[33] The law authorized by the indictment consists of the statutory elements of the offense as modified by the indictment allegations.[34] Statutory enhancements, though not strictly elements of the offense necessary to sustain a conviction, are also subject to the same sufficiency review on appeal, and in turn, are part of the hypothetically-correct-jury-charge analysis.[35] In reviewing the sufficiency of the evidence to support a

---

[31] *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

[32] *Id*. (finding jury instruction concerning legality of the appellant's detention should not have been used to measure the sufficiency of the evidence because legality of appellant's detention was not an element of the offense charged but was merely related to admissibility of evidence issue).

[33] *Id*.

[34] *Curry v. State,* 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

[35] *Curlee*, 620 S.W.3d at 779 (quoting *Young v. State*, 14 S.W.3d 748, 750 (Tex. Crim. App. 2000)).

statutory enhancement, reviewing courts must determine whether a rational trier of fact could have found the elements of the enhancement were met beyond a reasonable doubt.[36]

When considering a claim of evidentiary sufficiency, reviewing courts may not substitute their judgment for that of the factfinder by re-evaluating the weight and credibility of the evidence.[37] A jury is permitted to draw reasonable inferences from the evidence presented at trial, so long as each inference is supported by the evidence produced at trial.[38] Juries may use common sense, common knowledge, personal experience, and observations from life when drawing those inferences.[39] Juries are not, however, permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions.[40]

**Analysis**

---

[36] *Wood v. State*, 486 S.W.3d 583, 589 (Tex. Crim. App. 2016).

[37] *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) (quoting *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App.1999)).

[38] *Jackson*, 443 U.S. at 319; *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020) ("Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial.").

[39] *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014) ("[T]he trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence.").

[40] *Hooper*, 214 S.W.3d at 15.

As mentioned above, the question we are considering in an evidentiary sufficiency review is not whether the State presented *any* evidence to support Appellant's conviction, but whether there was legally sufficient evidence to support Appellant's conviction.[41]  Thus, our analysis focuses on whether the State's evidence proved the essential elements of the statutory enhancement under Sec. 46.02(c) beyond a reasonable doubt.  Under the version of Sec. 46.02(a) in effect on the date of Appellant's offense, a person could commit an offense by carrying a weapon in an area that was not his or her own premises or motor vehicle.[42]

At the time of the offense, "premises" was defined under Sec. 46.02 as including "real property and a recreational vehicle that is being used as a living quarters, regardless of whether that use is temporary or permanent."[43]  Thus, a person could generally commit a Class A misdemeanor if he or she intentionally, knowingly, or recklessly carried on or about his or her person a handgun, illegal knife, or club if the person was not on his or her own "premises," if the person was not on

---

[41] *Gollihar v. State*, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001).

[42] Tex. Penal Code Ann. § 46.02(a) (2016), *amended by* Act of June 15, 2017, 85th Leg., R.S., ch. 1049, 2017 Tex. Gen. Laws 4106, 4107.  In this way, the statute preserved a defendant's constitutional right to keep and bear arms on his or her own property. *See* Tex. Const. art. I, § 23.

[43] Tex. Penal Code Ann. § 46.02(a-2) (eff. Sept. 1, 2007).

a "premises" under his or her own control, or if the person is not inside of or directly en route to a motor vehicle the person owns or controls. Under the version of Sec. 46.02(c) in effect at the time, punishment for this offense could be enhanced to a third-degree felony if the offense was committed on "any premises licensed or issued a permit by this state for the sale of alcoholic beverages."

The enhancement contained in the version of Sec. 46.02(c) in effect at the time of the offense did not reference the definition of "premises" used in the Alcoholic Beverage Code for the purpose of issuing permits or licenses to sell alcoholic beverages. It did, however, require proof that the particular "premises" at issue was "licensed or issued a permit by this state for the sale of alcoholic beverages."[44] Perhaps in light of the statute's reference to state licensing, the trial court used the definition of "premises" contained in the Alcoholic Beverage Code in its charge to the jury, and the court of appeals relied upon it in its analysis.[45] This definition can be found under Sec. 11.49(a) of the Alcoholic Beverage Code, and it reads as follows:

---

[44] Tex. Penal Code Ann. § 46.02(c) (2016), *amended by* Act of June 15, 2017, 85th Leg., R.S., ch. 1049, 2017 Tex. Gen. Laws 4106, 4107 (repealed 2021).

[45] We note that some courts of appeals have held that the Alcoholic Beverage Code provides the appropriate definition of "premises" for purposes of enhancing punishment under § 46.02(c) (now repealed). *See, e.g.*, *Terry v. State*, 877 S.W.2d 68, 70 (Tex. App.—Houston [1st Dist.] 1994, no pet.) (finding that the Penal Code reference to "premises licensed . . . by this state for the sale . . . of alcoholic beverages," properly allows for the use of the Alcoholic

> In this code, "premises" means the grounds and all buildings, vehicles, and appurtenances pertaining to the grounds, including any adjacent premises if they are directly or indirectly under the control of the same person.[46]

Neither party has argued to the court of appeals or this one that the use of the Alcoholic Beverage Code's definition of "premises" to gauge the sufficiency of the evidence was improper. Accordingly, we will assume without deciding that this definition is the appropriate definition to be applied to the statutory enhancement under Sec. 46.02(c) as it existed at the time of the offense.[47]

Viewing the evidence in a light most favorable to the verdict, the State established that 1) the Crying Shame is a bar licensed to sell alcoholic beverages; 2) Appellant possessed a firearm in the parking lot in front of the Crying Shame and, during an altercation, outside of his

---

Beverage Code's definition of "premises" in the jury charge); *Richardson v. State*, 823 S.W.2d 773, 776 (Tex. App.—Fort Worth 1992, no pet.) (finding that the Alcoholic Beverage Code's definition of "premises" may properly be applied to § 46.02 of the Penal Code). We also note that the Legislature changed the definition of "premises" for purposes of this statute in 2017 to exclude parking lots. *See* Tex. Penal Code Ann. § 46.03(c)(4) ("'Premises' means a building or a portion of a building. The term does not include any public or private driveway, street, sidewalk or walkway, parking lot, parking garage, or other parking area.").

[46] Tex. Alco. Bev. Code Ann. § 11.49(a) (2016), *amended by* Act of June 9, 2017, 85th Leg., R.S., ch. 544, 2017 Tex. Gen. Laws 1515, 1516.

[47] Even if we were to rely upon the definition of "premises" found in Sec. 46.02(a-2) at the time of the offense it would not lead to a different result. Under the definition found in the Penal Code, the State would still have been required to prove that the parking lot at issue was part of the Crying Shame's "real property" to establish that it was a "premises licensed or permitted by this state for the sale of alcoholic beverages." And to the extent that it can be argued that "premises," as modified by the phrase "licensed or permitted by this state for the sale of alcoholic beverages," requires proof that the scope of the Crying Shame's license to sell alcohol extended to the parking lot, the State presented no evidence on that issue.

motor vehicle; and 3) Appellant had no control over the parking lot.  On the question of whether the parking lot was part of the "premises" of the Crying Shame, the State presented two witnesses who opined that the parking lot at issue was part of the "premises" or "property" of the Crying Shame.  Neither gave a basis for their respective opinions, and neither explained their understanding of the legal definition of "premises" in the context of unlawfully carrying a weapon.

We have repeatedly held that unsupported opinions do not always satisfy the beyond a reasonable doubt standard by themselves.  For example, in *Winfrey v. State*, we noted in our legal sufficiency review the concerns about reliance upon opinion testimony interpreting canine reactions to scent-discrimination lineups in a legal sufficiency analysis.[48]  We held that such evidence could only be supportive of a conviction and required some corroboration due to the dangers inherent in dog-tracking evidence.[49]  And in *Curlee v. State*, we held that an officer's opinion that a playground behind a church was "open to the public" did not establish that element beyond a reasonable doubt for purposes of enhancing the offense's punishment to a third-degree felony.[50]  We noted that without

---

[48] *Winfrey v. State*, 323 S.W.3d 875, 882-85 (Tex. Crim. App. 2010).

[49] *Id.* at 884.

[50] *Curlee*, 620 S.W.3d at 785.

a factual basis for the officer's opinion, it amounted to a factually unsupported inference or presumption.[51] Even coupled with the officer's observations that the fence surrounding the church playground was "unlocked at all times," we held that the evidence in *Curlee* was legally insufficient.[52]

More recently, in *Edwards v. State*, we held that an expert witness' opinion was legally insufficient to establish that an infant suffered a "serious mental deficiency, impairment, or injury" as a result of ingesting cocaine through the defendant's breastmilk.[53] Though the witness in *Edwards*, the owner of a drug screening and assessment center, testified that the amount of cocaine in the infant's system was indicative of an addict ingesting cocaine all the time, we held that the evidence was nevertheless legally insufficient. We reasoned that because the witness only offered hypothetical testimony regarding possible side effects from the amount of cocaine found in the infant's system the State had failed to prove the element of "serious mental deficiency, impairment, or injury" beyond a reasonable doubt.[54] We

---

[51] *Id*.

[52] *Id.* at 786.

[53] *Edwards v. State*, 666 S.W.3d 571, 576 (Tex. Crim. App. 2023).

[54] *Id*. at 573.

held that the jury could not, draw a reasonable inference about the existence of a "serious mental deficiency, impairment, or injury" because the opinion testimony at issue was not sufficiently supported by the facts of the case.[55]

In Appellant's case, Detective Williams was the only witness that testified that the parking lot was the "premises" of the Crying Shame. Detective William's opinion testimony is on par with opinion testimony we have previously held legally insufficient by itself. Like the officer in *Curlee*, Detective Williams did not offer any basis, such as familiarity with the business or the parking lot, for his opinion that the parking lot was part of the "premises" of the Crying Shame. And like the owner of the drug screening center in *Edwards*, Williams' opinion regarding whether the parking lot at issue was part of the "premises" of the Crying Shame was factually unsupported. Williams did not go to the parking lot on the night of the offense and there was no indication that he had ever been to the Crying Shame on any other occasion for any other reason. Nor did Williams tie his law enforcement experience to his legal conclusion that the Crying Shame controlled the parking lot. Like the witness in *Edwards*, Williams did not offer any specific facts to justify his

---

[55] *Id*. at 576-77 (citing *Hooper*, 214 S.W.3d at 16).

legal conclusion. Perhaps he could have, but the State did not question him further regarding the basis for his opinion.

Similarly, Cook's testimony that the parking lot was the Crying Shame's property was equally unsupported. The State offered no testimony to suggest Cook had any personal knowledge about the Crying Shame, or that she had even been there before the night in question. And while the State points to her general familiarity with residential property due to her recent employment as a property manager, this provided no more basis for her opinion than owning a drug-screening business provided the witness in *Edwards.*

The State maintains that because Appellant parked in close proximity to the bar's entrance, that it was reasonable for the jury to infer that the parking lot was under the Crying Shame's control. But a parking lot is not necessarily "directly or indirectly under the control" of an establishment simply because the lot is connected to or adjacent to the establishment.[56] Nor is it reasonable for a jury to infer that a parking lot is always under an establishment's control due to its proximity to its building because, for example, a permit or license applicant can exclude a portion of the property from its "premises" for purposes of the

---

[56] Tex. Alco. Bev. Code Ann. § 11.49(a) (2016), *amended by* Act of June 9, 2017, 85th Leg., R.S., ch. 544, 2017 Tex. Gen. Laws 1515, 1516.

Alcoholic Beverage Code.[57]  The proximity of the parking lot to an establishment is not necessarily determinative of control and to conclude otherwise would be mere speculation.[58]

As it did in *Curlee*, the State asks us to treat complaints regarding insufficiently supported lay opinion testimony as an admissibility issue subject to forfeiture for a failure to object.  We again reject the

---

[57] Tex. Alco. Bev. Code Ann. § 11.49(b) (2016), *amended by* Act of June 15, 2019, 86th Leg., R.S., ch. 1359, 2019 Tex. Gen. Laws 4992, 5007 ("Subject to the approval of the commission and except as provided in Subsection (c), an applicant for a permit or license may designate a portion of the grounds, buildings, vehicles, and appurtenances to be excluded from the licensed premises."); *see, e.g.*, *Curlee* at 794 (Keller, J., concurring) ("If a member of the public can be excluded just because the owner doesn't want him there, I think the property is not open to the public . . . But fence or no fence, if members of the public can be excluded by the owners arbitrarily, I would hold that a playground is not open to the public.").  An establishment may have an incentive to not include all property as part of its licensed premises. *See, e.g.*, Tex. Alco. Bev. Code Ann. § 69.13 (retail establishment license may be suspended or canceled if breach of peace occurs on the licensed premises when breach was not beyond control of the licensee and resulted from improper supervision of the licensed premises); Tex. Alco. Bev. Code Ann. § 28.11 (mixed beverage permit may be suspended or canceled if breach of peace occurs on the licensed premises when breach was not beyond control of the permittee and resulted from improper supervision of the licensed premises); Tex. Alco. Bev. Code Ann. § 11.61(b)(7) ("place or manner in which the permittee conducts the permittee's business warrants the cancellation or suspension of the permit based on the general welfare, health, peace, morals, and safety of the people and on the public sense of decency"); Tex. Alco. Bev. Code Ann. § 109.53 (use of a permit or the premises covered by such permit is unlawful when used by any person other than the one to whom the permit was issued).

[58] For example, we have held that, under the penal code's definition in place on and before the date of Appellant's offense, communal parking lots did not always satisfy the "premises" element under Sec. 46.02. *See, e.g.*, *Wilson v. State*, 418 S.W.2d 687, 688 (Tex. Crim. App. 1967) (holding that a tenant who carries a pistol upon the grass, sidewalks, driveway, and parking lot jointly used by all tenants of a large apartment complex is not on "one's own premises" within meaning of statute relating to unlawful carrying of firearms); *Bryant v. State*, 508 S.W.2d 103, 104 (Tex. Crim. App. 1974) (holding that a tenant who had a pistol in his hand while standing in a parking lot shared by other occupants of apartment complex was not on "one's own premises" within its meaning under the unlawful carrying of firearms statute); *cf*. *Chiarini v. State*, 442 S.W.3d 318, 319 (Tex. Crim. App. 2014) (holding that a condominium unit owner did not violate the unlawful carrying of a weapon statute when he carried a handgun in the common area of the condominium complex since he had an undivided interest in the common area, making the common area the owner's own "premises").

argument that it is incumbent upon the defendant to object to the deficiencies in the State's case if the State offers unsupported opinion testimony to prove an element of the offense or enhancement.  As we clarified in *Curlee*, a defendant's failure to object has no bearing on how an unsupported opinion should be treated on sufficiency review.[59]  The State's argument conflates the admissibility of evidence with the sufficiency of evidence.  "Evidence admissibility rules do not go to the general issue of guilt, nor to whether a conviction, as a matter of law, may be sustained."[60]  While prosecutors may satisfy various evidentiary rules, "this says absolutely nothing about whether they have introduced a quantum of evidence sufficient to convict the offender."[61]  Legal sufficiency is a higher burden, and is a distinctly separate inquiry from an admissibility challenge.[62]  Unlike evidentiary claims, legal sufficiency arguments do not need to be preserved.[63]  And requiring the defense to

---

[59] *Curlee*, 620 S.W.3d at 785.

[60] *Carmell v. Tex.*, 529 U.S. 513, 546 (2000).

[61] *Id*. at 547.

[62] *Jackson*, 443 U.S. at 319.

[63] *See Moore v. State*, 371 S.W.3d 221, 225 (Tex. Crim. App. 2012) ("[A] claim regarding the sufficiency of the evidence need not be preserved for review at the trial level and is not waived by the failure to do so.").

object to the sufficiency of the State's evidence would effectively shift all or some of the burden to the defense.[64]

Ultimately, the State asks us to reconsider our decision in *Curlee*. The State contends that a witness may have a perfectly good basis for his or her conclusion and, if no objection is made regarding the basis for that conclusion, jurors can still have a perfectly rational reason for believing the witness' conclusion. *Curlee*, the State argues, allows courts to "conjure up evidence" by determining that a witness' conclusion is without a basis. But this cuts both ways. Without facts supporting a witness' opinion, the jury is equally encouraged to "conjure up evidence" to support that witness' conclusion. While a lay opinion may provide a "mere modicum" of evidence to support an element simply by surpassing the relevancy bar, it does not necessarily satisfy the State's burden to prove that element beyond a reasonable doubt.

The State contends that, other than *Curlee*, there is no authority that says a jury cannot find that a fact exists based solely on the sworn testimony of someone who says it does. But *Curlee* does not hold that a jury cannot find a fact exists based solely upon the testimony of

---

[64] *See Patterson v. New York*, 432 U.S. 197, 215 (1977) ("Such shifting of the burden of persuasion with respect to a fact which the State deems so important that it must be either proved or presumed is impermissible under the Due Process Clause.").

someone who says it does. *Curlee* holds that a jury engages in speculation if a witness' opinion on a legal issue also amounts to speculation when the State fails to present facts supporting that opinion.[65] And this case is not about witnesses testifying to observable facts. This case is about witnesses who gave their opinions that an enhancement provision had been legally established without providing any factual basis for those opinions.

This holding is not new. For example, in *Garcia v. State*, we concluded that no rational fact finder could have determined that the defendant's child had sustained bodily injury or physical impairment as required to support a conviction for endangering a child.[66] We held that while there was testimonial evidence that the child was shivering, had blue lips, and wore only a wet diaper, no evidence established that she was experiencing physical pain or impaired organ function from being exposed to cold weather while wearing only a wet diaper.[67] We held that the evidence supported that the child was very cold, but that

---

[65] *Curlee*, 620 S.W.3d at 785.

[66] *Garcia v. State*, 367 S.W.3d 683, 689-90 (Tex. Crim. App. 2012).

[67] *Id*. at 688-89.

evidence did not then support the legal conclusion that the child experienced bodily injury or physical impairment.[68]

Likewise, in *Brister v. State*, we held an officer's testimony that the defendant violated a traffic law while there were very few, if any, other cars on the road, was legally insufficient to support a deadly weapon finding.[69] We concluded that it was not reasonable for the jury to infer that the defendant used his vehicle as a deadly weapon, even considering testimony of two other officers who stated that the defendant's vehicle was capable of causing serious bodily injury or death.[70] Because there was no evidence that the defendant caused another vehicle or person to be in actual danger, it was not reasonable for the jury to infer that he used his vehicle as a deadly weapon.[71]

Similarly, in *Flores v. State*, the defendant committed a robbery while pretending he had a gun which was actually an electric drill covered in plastic bags.[72] Although two officers testified that the drill could be used as a deadly weapon and there was video evidence that

---

[68] *Id*.

[69] *Brister v. State*, 449 S.W.3d 490, 495 (Tex. Crim. App. 2014).

[70] *Id*.

[71] *Id*.

[72] *Flores v. State*, 620 S.W.3d 154 (Tex. Crim. App. 2021).

showed the defendant had waved the drill around during the robbery, we held that no evidence suggested that the defendant used or intended to use the drill in a manner that was capable of causing death or serious bodily injury.[73]  Because the evidence only revealed that the defendant used the drill for intimidation purposes, we concluded that the evidence was legally insufficient to permit a jury to rationally conclude that Appellant used or intended to use the drill as a deadly weapon.[74]

Here, the State asks us to hold that the parking lot was the "premises" of the Crying Shame because two witnesses with no established familiarity with the location "believed" it to be.  But it was still incumbent upon the State to prove the "premises" element beyond a reasonable doubt.  None of the evidence presented by the State, by itself or when considered in its totality, supports the legal conclusion that the parking lot was part of the Crying Shame's "premises" beyond a reasonable doubt.

This is not to say that a parking lot can never be part of the "premises" of a business.[75]  Nor are we holding that the parking lot in

---

[73] *Id*. at 156-57.

[74] *Id*. at 161.

[75] *See, e.g., Terry*, 877 S.W.2d at 70 (evidence was legally sufficient to show club's parking lot was part of the "premises" of an establishment licensed to sell alcohol under Sec. 11.49(a) of the Texas Alcoholic Beverage Code based on TABC agent's testimony, club's TABC license, and testimony of club's bartender that the parking lot was maintained by club's employees).

this case was not part of the "premises" of the Crying Shame. And we are certainly not suggesting that a law enforcement officer or a lay witness cannot give a determinative opinion on a legal issue. We simply hold that in this case, the State did not provide legally sufficient evidence to support an enhancement element beyond a reasonable doubt. It presented opinion testimony on the legal issue without providing any factual basis to support that testimony.

## Conclusion

Viewing the evidence in Appellant's case in a light most favorable to the verdict and allowing the jury to draw reasonable inferences, the State has not met its burden in proving the "premises" element beyond a reasonable doubt. While the State introduced some evidence on that point, the opinion testimony by itself were merely supportive evidence that did not provide legally sufficient evidence without additional facts in the record to support those conclusions. Accordingly, we affirm the court of appeal's judgment and remand the case to the trial court for a new punishment hearing.

Delivered: May 22, 2024

Publish